IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FILED
November 29, 2005

CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| KARL EUGENE CHAMBERLAIN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 3:01-CV-0388-R |
| | § | |
| DOUG DRETKE,[1] Director, | § | |
| Texas Department of Criminal Justice | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER ON
## PETITION FOR WRIT OF HABEAS CORPUS

Karl Eugene Chamberlain has filed a petition for writ of habeas corpus by a person in state custody challenging his conviction in the 291st Judicial District Court, Dallas County, Texas for capital murder and imposition of a sentence of death. For the reasons hereinafter expressed, the court is of the opinion that the petition should be denied.

### A. PARTIES

Petitioner Karl Eugene Chamberlain, TDCJ # 999241, is in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division, and currently incarcerated in the Polunsky Unit, Livingston, Texas.

Respondent Doug Dretke is the Director of the Texas Department of Criminal Justice, Correctional Institutions Division.

### B. PROCEDURAL HISTORY AND BACKGROUND

Chamberlain was indicted in Cause No. F96-48383-SU and tried in the 291st Judicial District Court of Dallas County, Texas for the capital murder of Felicia Prechtl on or about August 2, 1991.

---

[1] Dretke is the current director of the Correctional Institutions Division of the Texas Department of Criminal Justice and the proper Respondent in this action. *See generally* Fed. R. Civ. P. 25(d).

(Clerk's R. 2).  The essential facts of the offense are summarized below.

Chamberlain and twenty-nine-year-old Felicia Prechtl lived in the same Dallas, Texas apartment building in 1991.  (31 S.F. 4907-08).[2]  Prechtl arrived home from work around 5:30 p.m. on Friday, August 2, 1991.  (30 S.F. 4689).  She had made arrangements for her brother Daniel and his girlfriend to babysit her five-year-old son, Shad, while she went to meet friends.  (30 S.F. 4655, 4690).  Daniel, his girlfriend, and Shad borrowed Prechtl's car shortly after 6 p.m. to go to a local grocery store and rent movies.  (30 S.F. 4657, 4690).  When they left, Prechtl had already changed clothes for the evening and was attired in cowboy boots, blue jeans, and a sweater.  (30 S.F. 4656, 4690).

Upon returning to the apartment approximately half an hour later, Daniel and his girlfriend noticed that the bathroom door was closed and heard the sound of running water.   (30 S.F. 4658).  They also noticed that  Prechtl's boots and sweater were lying in the hallway.  (30 S.F. 4667-68).  Daniel went to the telephone to order pizza.  His girlfriend sat down on the sofa and noticed that a roll of duct tape was on the sofa that had not been there when they left the apartment.   (30 S.F. 4659).  She shouted to Prechtl that she needed to hurry to avoid being late, and sent Shad to see what his mother was doing.  Shad returned, announcing that there was blood "all over."  (30 S.F. 4669).  Daniel was summoned, and upon entering the bathroom, he saw blood splattered across the counter and mirror.  (30 S.F. 4692).  The faucets at the sink and bathtub were running.  Daniel turned and saw his sister lying face down with blood pooled around her head.  (30 S.F. 4670). Her jeans and underwear were pulled down to her knees, and she was wearing no other clothing.  Her wrists and

_____

[2]  "S.F." is a reference to the statement of facts as recorded by the trial court reporter.  The number preceding the S.F. designation refers to the volume number and the number following the S.F. designation refers to the page on which the testimony or other evidence is located.

ankles were bound with duct tape.  (30 S.F. 4694, 4712).

An autopsy found the cause of death to be a gunshot wound to the head.  (30 S.F. 4834).  The medical examiner testified that the trajectory of the bullet was consistent with Prechtl either sitting on the toilet and leaning forward or kneeling or squatting on the bathroom floor when she was shot.  (30 S.F. 4831).  Gunpowder residue indicated that the weapon was fired from a distance of three to three-and-a half feet.  (30 S.F. 4830-32).  A .30 caliber cartridge casing was recovered from the bathroom floor, and the roll of duct tape was also collected as physical evidence.  (30 S.F. 4712-14).  Four fingerprints on the duct tape could not be identified, and when submitted for comparison in 1991, did not match any available prints in the law enforcement fingerprint database.  (30 S.F. 4735, 4742).  A rape examination found the presence of sperm in Prechtl's anal cavity, and specimens were preserved for DNA testing.  (31 S.F. 4878).  The case was ultimately turned over to the Dallas Police Department's "Cold Case Squad."  (30 S.F. 4764-66).

In 1996, the fingerprints collected from the roll of duct tape were resubmitted for comparison with the fingerprint database, and this time, several potential matches were located.  (30 S.F. 4743-44).  One of the potential matches was Karl Chamberlain, who had lived in an apartment above Prechtl in 1991 and had been interviewed on the night of the murder.  (30 S.F. 4745-52, 4847).  On July 17, 1996, Chamberlain was arrested in Euless, Texas and interviewed by Detective Kenneth Penrod with the Dallas Police Department.  (30 S.F. 4768).  Chamberlain subsequently provided the police with a written statement in which he admitted killing Prechtl.  According to Chamberlain's statement, he had been drinking on the day of the murder[3]  and went to Prechtl's apartment to

_____

[3]  Accordingly to police who interviewed Chamberlain on the night of the murder and Chamberlain's wife (who divorced him in 1992), Chamberlain showed no signs of intoxication that evening.  (30 S.F. 4849; 31 S.F. 4912).

borrow some sugar. (30 S.F. 4784). He asserted that she answered the door wearing a short top and no pants, gave him a cup of sugar, and told him to leave.[4] He stated that he returned to his apartment and was getting his dogs ready for a walk when he decided to return to Prechtl's apartment, this time with a roll of duct tape and a rifle. According to Chamberlain's statement, he had consensual anal sexual intercourse with Prechtl, but he shot her after she threatened to tell his wife. (30 S.F. 4784-86). He then returned to his apartment and took his dogs for a walk. (30 S.F. 4786).

During the interview, Chamberlain asserted that he had turned his life around after joining Alcoholics Anonymous (AA). (30 S.F. 4786-87). Chamberlain advised the police that they could find the weapon he used, a .30 caliber M–1 carbine rifle, at his father's house. The weapon was recovered and admitted as evidence at trial. (30 S.F. 4794-96). Chamberlain also provided DNA samples of blood that were tested and matched the sperm collected from Prechtl's body during the rape examination. (30 S.F. 4790-92; 31 S.F. 4885).

Chamberlain's trial commenced in May 1997. A jury found Chamberlain guilty of capital murder, and thereafter answered the special issues in such a way as to mandate imposition of the death penalty.[5] (Clerk's R. 164-66). *See generally* Tex. Code Crim. Proc. Ann. art. 37.0711, §3

---

[4] The detective testified that he intentionally refrained from challenging Chamberlain's statement about Prechtl's attire or any details Chamberlain gave about the night of the murder. (30 S.F. 4787-88).

[5] The jury unanimously answered the following issues in the affirmative:

ISSUE NUMBER 1

Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

ISSUE NUMBER 2

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

(continued...)

4

(Vernon 1981 & Supp. 2004-2005).   The Court of Criminal Appeals affirmed Chamberlain's conviction and sentence on direct appeal.  *Chamberlain v. State*, 998 S.W.2d 230 (Tex. Crim. App. 1999).  The United States Supreme Court denied Chamberlain's petition for writ of certiorari on January 10, 2000.  *Chamberlain v. Texas*, 528 U.S. 1082 (2000).

Chamberlain filed one state application for writ of habeas corpus on November 30, 1998. The Texas Court of Criminal Appeals denied the application with a written order on September 13, 2000 and therein adopted the findings of fact and conclusions of law entered by the state trial court. *Ex parte Chamberlain*, Application No. 46,058-01 (Tex. Crim. App. Sept. 13, 2000).  Chamberlain filed his federal petition for writ of habeas corpus on September 12, 2001, and  Respondent filed an answer on November 20, 2001.

D.  ISSUES

Chamberlain alleges the following as grounds for relief:

1. The State's habeas corpus procedures outlined in Article 11.071 of the Texas Code of Criminal Procedure violate due process and equal protection guarantees under the Fifth, Sixth and Fourteenth Amendments;

2. He was denied the effective assistance of counsel at trial because his attorney

   a. failed to properly advise him on the merits of a plea bargain offer;

   b. failed to present any witnesses during the guilt-innocence phase of trial; and

   c. failed to call Chamberlain as a witness during the punishment phase and presented no expert witness testimony on the issue of future dangerousness.

3. He was denied the effective assistance of counsel on appeal;

4. The Texas Court of Criminal Appeals violated due process guarantees by refusing

_____

[5](...continued)
(Clerk's R. 161-162).  The jury further found that there were no mitigating circumstance or other circumstances that would warrant a sentence of life imprisonment rather than a death sentence.  (Clerk's R. 163).

to review Chamberlain's challenge to the factual sufficiency of the evidence to support a finding of future dangerousness; and

5.   He was not provided with effective assistance of counsel during the state habeas proceedings.

### E.  RULE 5 STATEMENT

Respondent contends that Petitioner has failed to exhaust his state remedies with respect to some aspects of Issues 1, 2, and 5, but does not move for dismissal on this ground.

### F.  STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court.  28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). A state court decision will be an unreasonable application of clearly established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case.  *Williams*, 529 U.S. at 407-08.

Further, federal courts give great deference to a state court's factual findings.  *Hill*, 210 F.3d at 485.  Factual determinations by a state court are presumed correct absent clear and convincing

evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2), (e); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams*, 529 U.S. at 399.  The applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

G.   DISCUSSION

1.      State Habeas Procedures

Chamberlain contends that the State's procedural system for applications for writ of habeas corpus in death penalty cases denied him due process and equal protection as guaranteed by the Fifth, Sixth and Fourteenth Amendments.  More specifically, he complains that Article 11.071 of the Texas Code of Criminal Procedure is unconstitutional because it forces an applicant who has been given the death penalty to file his habeas application before an opinion has been rendered in his direct appeal, putting him at a disadvantage in fully presenting his claims for collateral relief.[6] Respondent asserts that Chamberlain has failed to allege a cognizable constitutional violation for purposes of federal habeas corpus review.[7]

Section 4(a), Article 11.071 of the Texas Code of Criminal Procedure provides that

[a]n application for a writ of habeas corpus, returnable to the court of criminal

---

[6]Although Chamberlain alleges generally that Article 11.071 violates equal protection guarantees, he fails to brief this point or otherwise develop a basis on which an equal protection claim might entitle him to relief.

[7] Dretke also contends that Chamberlain's arguments of a Sixth Amendment violation should be considered unexhausted.  The state trial court's findings of fact include the notation that Chamberlain was challenging Article 11.071 on Sixth Amendment grounds,  (State Habeas R. 50), and the trial court entered a specific finding that Article 11.071's procedural requirements did not interfere with Chamberlain's right to appointed at counsel at trial or on appeal. (State Habeas R. 53). Dretke's contention of a lack of exhaustion is unsupported by the record.

appeals, must be filed in the convicting court not later than the 180th day after the date the convicting court appoints counsel under Section 2 or not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals, whichever date is later.

Tex. Code of Crim. Proc. Ann., art. 11.071, § 4(a) (Vernon 2005). This statutory requirement resulted in Chamberlain having to file his application for state habeas relief before the Texas Court of Criminal Appeals had issued a decision in Chamberlain's direct appeal. (State Habeas R. 52).

As a threshold matter, infirmities in state habeas proceedings are not proper grounds for federal habeas relief. *See Rudd v. Johnson*, 256 F.3d 317, 319-20 (5th Tex. 2001); *Wheat v. Collins*, 238 F.3d 357, 361 (5th Cir. 2001); *Nichols v. Scott,* 69 F.3d 1255, 1275 (5th Cir.1995); *Duff-Smith v. Collins,* 973 F.2d 1175, 1182 (5th Cir.1992). *See also Vail v. Procunier*, 747 F.2d 277, 277 (5th Cir.1984). Because Chamberlain does not allege any cognizable basis for relief, reasonable jurists could not debate the state court's decision to deny relief on this ground.

Moreover, Chamberlain does not allege any new ground for relief that he was unable to raise in his state writ application because the ground became evident only after the Texas Court of Criminal Appeals decided his direct appeal. Chamberlain proposes as a hypothetical matter that claims of ineffective assistance of counsel may not be apparent until after the case has been reviewed on direct appeal; however, he does not allege that such a problem actually arose in his case. In fact, Chamberlain presented several complaints about trial counsel and appellate counsel in his state application for writ of habeas corpus, and he has not identified additional matters he would have raised but for the expedited nature of the State's collateral review process in death penalty cases. The State provides protection for just such instances by authorizing a subsequent application for writ of habeas corpus if there is a claim that has not been and could not have been

presented in the initial application because the factual or legal basis of the claim was not available at the time.  Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a) (Vernon 2005).

Chamberlain has presented no evidence that the requirement under Article 11.071 that his initial application for writ of habeas corpus be filed before the direct appeal has been decided prevented him from raising any claim that he wanted to at the state level.  Chamberlain fails to demonstrate that the state court's rejection of his complaint was contrary to, or involved an unreasonable application of, clearly established federal law.

2.      Ineffective Assistance of Trial Counsel

Chamberlain contends that he was denied his Sixth Amendment right to counsel because defense counsel was constitutionally inadequate both before and during trial.  The two-pronged standard by which a claim of ineffective assistance of counsel is measured is set forth in *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984).  The first prong of *Strickland* requires the defendant to show that counsel's performance was deficient in that the errors made were so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.  *Id*. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d 674.  The second prong requires the defendant to show prejudice by demonstrating that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id*. at 694, 104 S.Ct. at 2068, 80 L.Ed. 2d 674.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id*. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d 674.

The state court rejected Chamberlain's complaints about his trial counsel.  A claim of ineffective assistance is a mixed question of law and fact.  *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070, 80 L.Ed.2d 674.  Therefore, the federal court cannot grant habeas relief unless the state court's

rejection of the claim involved an unreasonable application of the law to the facts.  28 U.S.C. § 2254(d)(1).  As addressed in more detail below, Chamberlain has not shown that the state court unreasonably applied the law to the facts in his case.

      a.    Plea Bargain

Chamberlain contends that his initial trial counsel, Rick Magnis, did not properly advise him on the terms of the State's plea bargain offer.  The prosecutor had offered Chamberlain the option of pleading guilty to murder and burglary and serving two consecutive life sentences for these offenses.  (State Habeas R. 71).  Chamberlain declined the offer.

Chamberlain asserts that Magnis told him that he would have to serve thirty years on one sentence and an additional fifteen years for the second sentence, a total of forty-five years, before he would be eligible for parole.  (Pet. at 13-14).  Conversely, Magnis submitted an affidavit during the state habeas proceedings in which he recalled conveying the plea bargain offer to Chamberlain and advising him that he would not be eligible for parole for thirty years.  (State Habeas R. 72, 178).  Magnis also stated that he had cautioned Chamberlain that the actual amount of time he would spend in prison was in the discretion of the Texas Board of Pardon and Paroles, and based on the circumstances of the offense, he might never be paroled.  (State Habeas R. 178).  In addition, Magnis arranged for another defense attorney with significant experience trying death penalty cases to speak with Chamberlain and explain the offer.  (State Habeas R. 72).  The state trial court specifically found that Magnis correctly advised Chamberlain that he would serve a minimum of thirty years in prison and that his release thereafter was at the discretion of the Board of Pardon and Paroles.  (State Habeas R. 72-73).

Chamberlain asserts that the state court's determination is unreasonable.  Chamberlain argues

that he and his trial counsel were not "on the same page" during their conference about the plea bargain offer, and he asserts that he was dissuaded from accepting the offer because of predictions about parole that no attorney is qualified to make.  (Pet. at 15-16).

Post-conviction assertions by a petitioner that he wanted to plead guilty but for counsel's advice are viewed with suspicion.  *See Green v. Johnson*, 46 F. Supp. 2d 614, 622-23 (N.D. Tex. 1999).  In the instant case, the state trial court considered Chamberlain's assertions, but ultimately found Magnis's affidavit more credible, including Magnis's recollection that Chamberlain rejected the offer based on his belief that he would not be convicted of capital murder and would not receive the death penalty even if convicted.   (State Habeas R. 72-73, 178).  Chamberlain has not demonstrated that the state trial court was unreasonable in finding that counsel was not ineffective and had properly advised Chamberlain about the plea bargain offer.

b.      Guilt-Innocence Phase

Chamberlain contends that his trial attorneys, Wayne Huff and Doug Parks, were ineffective in failing to present any fact witnesses during the guilt-innocence phase of trial.  The state court found that Chamberlain had not identified or provided any evidence that there were fact witnesses that counsel could have called during the guilt-innocence phase. (State Habeas R. 80).  The state court also outlined the evidence of guilt that was presented at trial, including Chamberlain's fingerprints on the roll of duct tape, DNA test results, and the written statement Chamberlain gave to police.  The state court found it was reasonable trial strategy for defense counsel to decline to present witnesses at this stage of trial when no witnesses were available to testify on Chamberlain's behalf.  (State Habeas R. 80).

Chamberlain asserts that the state court was wrong because there was one fact witness that

could have testified, namely Chamberlain himself.  Chamberlain contends that counsel should have had him testify about the involuntary nature of his statement to the police in an effort to have it excluded by the court or rejected by the jury.[8]

Dretke asserts that Chamberlain's complaint is unexhausted because he did not present this same claim to the state court.  Although Chamberlain previously raised a general complaint about counsel's failure to call any fact witnesses during the guilt-innocence phase, he never identified himself as one of those favorable witnesses who was not called.  In fact, he argued during the state court proceedings that counsel's failure to produce any fact witnesses during the guilt-innocence phase supported his belief that he should have pleaded guilty and not risked alienating the jury. (State Habeas R. 22-23).

A petition for writ of habeas corpus shall not be granted unless the applicant exhausted his state court remedies.  28 U.S.C. § 2254(b), (c).  A claim must be presented to the highest court of the state to satisfy the exhaustion of state court remedies requirement. *Richardson v. Procunier*, 762 F.2d 429, 430 (5th Cir. 1985); *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982).  The exhaustion requirement is not met if a petitioner presents new legal theories or new factual claims in his federal application. *Whitehead v. Johnson*, 157 F.3d 384,387 (5th Cir. 1998). Remand however, would be serve no purpose in this case.

The general rule that a state court must explicitly apply a procedural bar to preclude federal review is not applicable to cases in which the petitioner failed to exhaust his state court remedies

---

[8]   In support, Chamberlain relies on an affidavit from his father, Edward Meeks.  Meeks asserted that Chamberlain's statement was a product of improper interrogation techniques,  (Pet. at 19-21), although there is no indication how Meeks acquired this information. The detective in charge of the case testified that he and Chamberlain were the only two people in the room during the interview.  (6 S.F. 697).

and the state court to which he would be required to present his unexhausted claims would now find

those claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 2557,

115 L.Ed. 2d 640 (1991).  In such cases, there is a procedural default precluding federal habeas

review.  *Id.*  If the federal courts required Chamberlain to return to the Texas Court of Criminal

Appeals to satisfy the exhaustion requirement, that court would apply the Texas abuse of the writ

doctrine as codified for purposes of death penalty cases.  *See* Tex. Code Crim. Proc. Ann. art. 11.071,

§5 (Vernon 2005).  Abuse of the writ qualifies as a procedural bar.  *See Busby v. Dretke*, 359 F.3d

708, 724 (5th Cir. 2004).

The Texas Court of Criminal of Appeals will review successive applications only in limited

circumstances, including:

> (1) the current claims and issues have not been and could not have been presented
> previously in a timely initial application or in a previously considered application
> filed under this article or Article 11.07 because the factual or legal basis for the
> claim was unavailable on the date the applicant filed the previous application;
>
> (2) by a preponderance of the evidence, but for a violation of the United States
> Constitution no rational juror could have found the applicant guilty beyond a
> reasonable doubt; or
> (3) by clear and convincing evidence, but for a violation of the United States
> Constitution no rational juror would have answered in the state's favor one or
> more of the special issues that were submitted to the jury in the applicant's trial
> under Article 37.071 or 37.0711.

Tex. Code Crim. Proc. Ann.  art. 11.071, §5(a) (Vernon 2005).  There is no showing that

Chamberlain can meet any of these exceptions.  Accordingly, when it would be pointless to require

Chamberlain to file a second state habeas application, the federal courts can appropriately find that

13

a procedural bar precludes federal review of the unexhausted claim.[9]  *See Busby*, 359 F.3d at 724-25.

Moreover, Chamberlain cannot succeed even if the court considers his claim on its merits. Defense counsel requested a pretrial hearing on the voluntariness of Chamberlain's written statement.  (Clerk's R. 23-24).   The trial court held a hearing on March 4, 1997 to address the voluntary nature of Chamberlain's statement and its admissibility, and after hearing evidence and arguments, ruled that the statement was voluntarily given.  (6 S.F. 664-705).  Chamberlain does not challenge any aspect of this pretrial hearing.  Additionally, the statement did not stand alone.  The prosecution  introduced fingerprint and DNA evidence confirming Chamberlain's presence at the crime scene.  Counsel, as a matter of strategy, could have determined that putting Chamberlain in front of the jury to complain about the interrogation was riskier and more likely to alienate the jury, especially for purposes of the subsequent punishment proceedings that were the obvious focus of defense counsel's efforts.   Instead, counsel chose to question the interviewing detective about Chamberlain's demeanor during the interview and elicited evidence that Chamberlain cried when discussing the murder and was apologetic when a civilian female employee entered the room to witness Chamberlain's signature on the written statement.  (30 S.F.  4799-4801).

Chamberlain has failed to exhaust state court remedies with respect to his complaint, nor has he demonstrated that trial counsel was ineffective in failing to present fact witnesses during the guilt-innocence phase. No relief is appropriate.

       c.       Punishment Phase

---

[9]  When there is an adequate and independent procedural bar, a federal habeas petitioner may not obtain relief unless he establishes cause for the default and actual prejudice. *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546.  The procedural bar may also be avoided if a petitioner can establish that a fundamental miscarriage of justice would result from application of the bar; however, this requires a statement and persuasive showing that he is actually innocent. *Id*. Chamberlain makes no showing of cause or prejudice to excuse the procedural bar, nor does he claim that the actual innocence exception applies in his case.

Chamberlain contends that his trial counsel was ineffective in failing to present expert witness evidence on the issue of Chamberlain's future dangerousness and deciding not to call Chamberlain as a witness during the punishment phase of trial.  Chamberlain's complaints require an overview of the evidence that was presented during the punishment phase.

 The prosecution's first witness during the punishment phase was Chamberlain's former stepmother, Marsha Meeks, who testified that Chamberlain came to live with her, his father, and his stepsister in 1985 at the age of 15.   She testified that Chamberlain required significant supervision while living with them.  (32 S.F. 4952).   Meeks testified that Chamberlain had been caught stealing while living with them. She testified that Chamberlain stole $50 from a family friend, and stole additional money and jewelry that Meeks kept hidden in her bedroom.  (32 S.F. 4956, 4959).  Chamberlain also broke into the family garage, which his father kept locked, and took his stepmother's car without permission. (32 S.F. 4976).  Meeks testified that Chamberlain had lied to the family on a chronic basis.  (32 S.F. 4958).  She noted that Chamberlain would confess if there was incontrovertible evidence of his guilt, but would otherwise try to deny responsibility.  Once he was caught, he was always apologetic and remorseful.  (32 S.F. 4960).  Meeks gradually came to believe that Chamberlain's remorse and tears were an act.   (32 S.F. 4961).

Marsha Meeks described Chamberlain as very bright and testified that he took advanced physics and math classes in high school.  (32 S.F. 4963).  His grades started to fall after he was placed on probation for shoplifting, but he did graduate in 1988.   (32 S.F. 4966, 4980-81). Chamberlain joined the Army,  was discharged in 1990, and married his high school girlfriend.  (32 S.F. 4968-71).  Meeks' contact with Chamberlain was more limited after that time, but Chamberlain did call home once to alert them that the police wanted him for a purse snatching.  He claimed it was

a case of mistaken identity. (32 S.F. 4972).

Jennifer Widney was Chamberlain's stepsister. After he moved in with the family, Widney thought it was strange that Chamberlain joined Alateen and a group called TOAST, for teenage alcoholics, when she had never seen Chamberlain under the influence of alcohol or drugs. (32 S.F. 5000-02). She testified that she once awoke to find Chamberlain in her room going through her jewelry box. (32 S.F. 5004-06). When confronted, Chamberlain said he wanted to give one of the rings to a girl he liked. Widney eventually set up a mechanism to determine whether Chamberlain had entered her room when she was not home. Widney also searched Chamberlain's room and found a pair of her mother's panties wrapped around a whisk and concealed in Chamberlain's night stand. She found approximately twenty pornographic magazines hidden under her stepbrother's bed, and testified that he often watched pornography on television when their parents were gone. She also caught Chamberlain in the attic trying to see into her room. (32 S.F. 5012). Widney testified that she had seen an unclothed mannequin in Chamberlain's closet and noticed that the crotch had been cut out.[10] (32 S.F. 5010). Widney had little contact with her stepbrother after he left home.

Chamberlain's platoon sergeant testified that Chamberlain was a marginal and substandard soldier, despite counseling sessions to address deficiencies in his performance. (33 S.F. 5163-72). Chamberlain also underwent a hearing before his commanding officer for assaulting another soldier with a knife. (33 S.F. 5174). He was punished with a reduction in rank and suspension of pay, and received a general discharge a few months later. (33 S.F. 5176).

Chamberlain's ex-wife, Angela McMillan, testified that she married Chamberlain in May

---

[10] Chamberlain's neighbor at the time testified that the mannequin, which his wife used for her sewing, had been stolen from his garage. (33 S.F. 5153-56). The neighbor later found the mannequin in his trash can with the face destroyed and the breasts and crotch area removed. (33 S.F. 5157).

1990, one month after he was discharged from the military. (32 S.F. 4985-86). McMillan testified that their marriage was troubled because Chamberlain lied to her on a daily basis. (32 S.F. 4988). She also testified that Chamberlain kept pornographic videos and magazines hidden around their apartment. (32 S.F. 4989). She testified that Chamberlain would drink occasionally, but she never saw him very intoxicated. Usually he limited his drinking to one or two wine coolers. (32 S.F. 4990). McMillan testified that Chamberlain tried to convince her to have anal sex with him, and had once tied her up with black electrical tape while the two were engaged in a sexual act. (32 S.F. 4992). McMillan left Chamberlain and filed for divorce in 1992. (32 S.F. 4993). She testified that they argued frequently, but Chamberlain was never physically violent during their marriage. (32 S.F. 4994).

Sunni Marrs also testified. She and her boyfriend had resided with Chamberlain and his wife in 1990-1991, and Chamberlain once showed Marrs a rifle he kept when he was discharged from the military. Marrs testified that Chamberlain bragged about collecting extra money at his job with an electronics retailer by overcharging customers and pocketing the money. (32 S.F. 5026-27). Marrs also testified that Chamberlain had made sexual advances toward her. (32 S.F. 5030). One morning when they were alone, Chamberlain told her that he had married too young and that things would be better with his wife if he had dated or had sexual contact with at least one other person. (32 S.F. 5031-33). He asked Marrs if she would agree to have sex with him and she refused. Chamberlain kept moving closer to her and began touching her, which frightened Marrs. (32 S.F. 5035-37). Marrs felt intimidated because he was bigger than she was. The episode was interrupted when Chamberlain's wife telephoned from work. (32 S.F. 5038).

Marrs testified that Chamberlain stayed behind after his wife left for work the next morning

and told Marrs that he called in sick to work because he wanted to continue his conversation with Marrs. (32 S.F. 5040). He sat down next to Marrs on the sofa and unzipped his pants and began rubbing his crotch against Marrs. She asked him to stop and was afraid that she could not talk him out of his intentions. He appeared to be angry when she told him she was not interested, but when Marrs started to cry, he apologized and left the room. (32 S.F. 5040-52). Marrs moved out a few weeks later.

Chamberlain's roommate in 1993 testified that Chamberlain habitually visited topless bars and occasionally brought one of the dancers home with him. (33 S.F. 5226-27). Another roommate testified that Chamberlain had a large collection of pornographic magazines and videotapes, as well as an anatomically correct inflatable female doll. (33 S.F. 5239-43).

Chamberlain arranged for a counseling session with therapist Lynn Mabe in February 1992, apparently at the suggestion of an attorney. (33 S.F. 5256). During the session, he disclosed that he was in trouble for using a stun gun on a woman. (33 S.F. 5255-56). He described feelings of depression, fear, anger towards his mother, and suicidal thoughts. He was also having marital difficulties. During a second session with Mabe, he confessed to her that he had gone to his neighbor's house with a rifle and duct tape and asked to borrow some sugar. When he was invited into the apartment, he raped and shot the woman. (33 S.F. 5259-60). Mabe thought that Chamberlain was recounting a fantasy because of his calm demeanor when he told her what he had done. Mabe subsequently decided that Chamberlain should be referred to a male counselor because many of his problems focused on his relationships with women.

Denise Pease was another witness for the State. She testified that Chamberlain robbed her in the parking lot of the Galleria Mall in Houston, Texas on September 27, 1991. (35 S.F. 5430).

18

In the process, he used a stun gun on her and raised several whelps on her arms.  (35 S.F. 5437-42).
Chamberlain threw Pease on the ground, took her purse, and fled in a car that was later traced to
Chamberlain's employer.  (34 S.F. 5275-77; 35 S.F. 5444-46).  Chamberlain provided the police
with a written statement admitting his guilt, pleaded guilty to robbery, and received a punishment
of ten years' probation and a fine.  (32 S.F. 4980-81; 34 S.F. 5310-14).

Two other women, Lucy Mennie and Tangie Keller, testified that they were employed by
a Pennsylvania travel agency in early 1992. The two women testified that they each received a series
of harassing phone calls in March 1992.  At first, the caller would moan and groan, but then
progressed to making sexually explicit and obscene comments.  (34 S.F. 5324-30; 5340-43).
Another Pennsylvania resident, Sara Lawson, testified that she had received similar calls during the
same time frame.  (34 S.F. 5351-59).   Lawson's son testified that he once took the phone from his
mother and threatened the caller if he didn't stop calling.  (34 S.F. 5363).  The caller responded by
threatening to shoot Lawson's son in the head.  (34 S.F. 5363).

The calls were reported to the police department and subsequently traced to Chamberlain's
employer in Texas and to Chamberlain's extension.  (34 S.F. 5395-97; 34 S.F. 5405).  Chamberlain
worked for the company as a telemarketer, and Pennsylvania was within his marketing territory.  (34
S.F. 5403).  The office telephone system was set up to limit a telemarketer to calling telephone
numbers only within his territory in an effort to keep long distance charges and personal calls to a
minimum, and a computer system monitored each worker's daily telephone calls.  (34 S.F. 5403).
Chamberlain's supervisor testified that he confronted Chamberlain, who initially acted surprised at
the accusation.  When presented with the computerized telephone records, his demeanor changed
and he became apologetic.  (34 S.F. 5407).

19

Defense counsel called numerous witnesses during the punishment phase, including Chamberlain's father, Edward Meeks. Meeks testified that he had been an alcoholic and a lousy father. Meeks and Chamberlain's mother had never married, and Chamberlain was raised by his mother. (35 S.F. 5465-67). When Chamberlain was approximately twelve years old, his mother complained that he was causing trouble and sent him to live with Meeks for two years. (35 S.F. 5467). Chamberlain moved back to his mother's home when he was fourteen, but returned a year later. (35 S.F. 5471-72). Meeks testified that Chamberlain had stolen money from him and from neighbors, and Meeks had installed a lock on his bedroom door to try and prevent Chamberlain from stealing. (35 S.F. 5466, 5480-81). Meeks admitted that he took his son to visit a prostitute when he was seventeen or eighteen to "give him more confidence." (35 S.F. 5488). Meeks testified that Chamberlain confessed in late 1991 that he had killed someone while he was drinking and using cocaine, but Meeks testified that he did not believe his son was telling the truth. (35 S.F. 5486).

Chamberlain's mother, Donna Arthur, also testified for the defense. She identified Chamberlain as the oldest of her nine children. (35 S.F. 5490-91). She dated Meeks for approximately one year, but she described their relationship as troubled because both of them drank and used drugs. She testified that she used marijuana and amphetamines while pregnant, and continued to drink alcohol. (35 S.F. 5492-93). Arthur moved to Oklahoma because of her job, and Chamberlain was born in Oklahoma City on June 20, 1970. Arthur described a difficult child birth and noted that forceps were used during delivery that left a lesion on her son's head that had to be surgically removed later. (35 S.F. 5494). Arthur testified that Chamberlain was a bright child and a good baby. He was speaking in sentences at an early age, and his mother placed him in a Montessori school when he reached school age. (35 S.F. 5496). However, Arthur also testified that

20

she had been in a five-year relationship with a man who was a heroin user and abusive when Chamberlain was young.  Arthur conceded that she had been both physically and emotionally abusive towards her son as well, and testified that she had lacked basic mothering skills.  (35 S.F. 5501). Arthur left her boyfriend when Chamberlain was about eight years old.  She moved to New Mexico, where she met and married her current husband.  (35 S.F. 5498-99).

Arthur testified that her son became a manipulative liar after the move to New Mexico. Counseling was attempted, but Arthur finally decided that some of her son's discipline problems might be better addressed if Chamberlain was living with his natural father.  (35 S.F. 5500).  She sent Chamberlain to live with his father again a few years later because Chamberlain wanted to move.  Arthur testified that she had confronted her son about inappropriate behavior when he undressed his five-year-old sister, but denied that this was the reason Chamberlain moved to his father's house in Texas.  (35 S.F. 5501).  Chamberlain's acts of misconduct while living with his mother included arson, forging checks stolen from the family business, and stealing from neighbors. Arthur testified that she had seen a change in Chamberlain in the last three or four years.  He had a better relationship with his siblings and had stopped lying to the family.  (35 S.F. 5506).

Chamberlain's therapist, John Brown, testified.  He began counseling Chamberlain in mid-1992, and most of the sessions addressed Chamberlain's troubled marriage.  (35 S.F. 5534-46). Chamberlain, however, also told Brown that he had a dark episode in his past and wanted forgiveness.  Brown set up an "empty chair exercise," in which the patient speaks to the person he would most like to talk with.  (35 S.F. 5537).  Chamberlain was grief-stricken and cried during the exercise.  He expressed sorrow about killing Prechtl and the effect her death had on her son.  (35 S.F .5538).  Brown opined that Chamberlain's most troubling problems revolved around his relationship

with his parents.  (35 S.F. 5541).

Chamberlain's probation officer testified that Chamberlain was considered a low to moderate risk as a probationer.  (35 S.F. 5520-26).  Defense counsel also called more than a dozen friends and acquaintances who knew Chamberlain through Alcoholics Anonymous or a Dungeons and Dragons gaming group to testify that Chamberlain was generally likeable and had never been abusive or violent in their presence.  (35 S.F. 5564-68, 5574-78, 5582, 5590-93, 5606-07, 5611-12, 5625-26, 5631, 5636-38, 5651-52, 5655, 5662-63, 5668-70, 5680-81 ).  Defense witnesses also testified that they thought Chamberlain had a good relationship with his girlfriend, Margo James.  (35 S.F. 5581, 5591).  James testified that she moved in with Chamberlain shortly after they began dating, and she was still living with him six months later when he was arrested for Prechtl's murder.  (35 S.F. 5697-5706).  The defense also called a Dallas County jailer to confirm that Chamberlain had no disciplinary incidents since being incarcerated at the county jail the previous July.  (35 S.F. 5599-5600).

In rebuttal, the prosecution called Chamberlain's sponsor in Alcoholics Anonymous, Rob Sproul, who testified that Chamberlain admitted to him that he had killed someone.  (36 S.F. 5721-22).  Chamberlain claimed to be "strung out" at the time.  Chamberlain's sponsor was concerned and asked an attorney what to do, and later advised Chamberlain that he would have to contact the authorities if Chamberlain committed another violent act.  (36 S.F. 5726).  Chamberlain also told Sproul about using a stun gun on a woman in Houston; trying out the stun gun on a shop proprietor at an unidentified business; and burglarizing an adult video store in 1993 or 1994 and stealing videos and an inflatable doll.  (36 S.F. 5730-32).  Chamberlain admitted meeting women at topless bars and paying some of them to have sex with him.  (36 S.F. 5732).

On cross-examination, defense counsel was able to elicit testimony from Sproul that Chamberlain was upset and emotional when recounting the details of the murder. (36 S.F. 5736). Chamberlain appeared to regret what he had done and expressed concern about the victim's son. (36 S.F. 5736-37). Sproul testified that Chamberlain also expressed a lot of anger about his mother and described being sexually and physically abused as a child. (36 S.F. 5739-40). Sproul opined that Chamberlain would not be dangerous as long as he remained sober. (36 S.F. 5743-44).

The prosecution also called Tameka Gray, who testified that she had met Chamberlain in 1995 while she was working as a topless dancer. (36 S.F. 5790-91). She testified that Chamberlain once suggested that he take her home and tie her up; however, she ended the conversation because it was not her practice to take customers home with her. (36 S.F. 5795-96, 5801).

(I)     Chamberlain as a Fact Witness

Chamberlain complains that his trial counsel should have allowed him to testify during the punishment phase and express his remorse to the jury. He notes that the underlying facts were egregious and the State was also able to introduce evidence of several instances of violence or bad acts in his history. He asserts that there was no plausible defense strategy in preventing him from testifying during the punishment phase in an effort to spare his life.

Chamberlain raised this complaint in his state application, claiming that defense counsel was deficient in convincing him and his family that he should not testify. The state court noted that the decision to testify belongs to the defendant; however, the court found that Chamberlain risked waiving his Fifth Amendment privilege, and any ground of error on appeal based on his Fifth Amendment rights, if he testified. (State Habeas R. 95-96). The state court further found it was reasonable trial strategy to advise a defendant against testifying and opening himself up to

23

aggressive cross-examination. (State Habeas R. 96). The state court determined that Chamberlain had not demonstrated that defense counsel's advice against testifying constituted ineffective assistance.

Although Chamberlain urges that he could have testified about his remorse, defense counsel was able to present that evidence through other sources–including testimony from Chamberlain's counselor and his sponsor with Alcoholics Anonymous. Even the detective who interviewed Chamberlain testified that Chamberlain cried and apologized in the course of providing a written statement admitting what he had done. If Chamberlain had testified to reiterate how remorseful he was about the murder, he would have exposed himself to impeachment and cross-examination. (State Habeas R. 96). Defense counsel could have reasoned that allowing Chamberlain to testify would result in harsh questions from the prosecution about his affinity for pornography and exotic dancers, as well as a rehash of the most brutal details of Prechtl's murder and Chamberlain's transparent effort in his written statement to shift some of the responsibility for the sexual assault and the murder to Prechtl.

Chamberlain has failed to demonstrate that the state court was unreasonable in finding that defense counsel was not deficient in advising Chamberlain not to testify, nor has he established a reasonable probability that his testimony would have altered the outcome of the punishment proceedings.

(ii)     Expert Witness Evidence on Future Dangerousness

Chamberlain asserts that defense counsel was ineffective in failing to present expert witness evidence on the issue of Chamberlain's future dangerousness, which is one of the special issues that determine whether a sentence of death is appropriate.

In rebuttal during the punishment phase of trial, the prosecution called psychiatrist Kenneth Dekleva to testify on the issue of Chamberlain's future dangerousness. Neither side had previously offered any expert witness testimony on this issue. (36 S.F. 5829). Dekleva had not examined Chamberlain, but gave a presumptive diagnosis of antisocial personality disorder and sexual sadism based on the evidence available to him. (36 S.F. 5866-73). Dekleva testified that a fusion of these two disorders was highly dangerous and made Chamberlain a continuing threat. (36 S.F. 5873-74).

Defense counsel thereafter announced its intention to call its own expert, J. Crowder, M.D. Crowder had examined Chamberlain and was expected to testify that Dekleva was incorrect and irresponsible in predicting that Chamberlain posed a future danger to society, especially if placed in a structured setting like a penitentiary. (36 S.F. 5911-13). Crowder was also expected to address the existence of mitigation evidence. (36 S.F. 5913). The trial court ruled that Crowder could not testify because Chamberlain had refused to be interviewed by Dekleva, the prosecution's expert. (37 S.F. 5907; State Habeas R. 82).

Chamberlain asserts that the trial court's ruling was not an insurmountable obstacle for the defense. He suggests that defense counsel could have called Crowder and limited his testimony to hypothetical questions based on the same records available to Dekleva, or alternatively, defense counsel could have called another mental health expert who had not examined Chamberlain.

The state court addressed the expert witness issue in Chamberlain's state application for habeas relief, but found no merit to Chamberlain's complaint. The state court cautioned against judging counsel's performance in hindsight and found it was not ineffective for defense counsel to highlight ambiguities in the prosecution's evidence instead of having an expert witness to testify on the issue of future dangerousness in general. (State Habeas R. 86-87). The state court noted that

defense counsel had elicited admissions from Dekleva that he had always testified as a witness for the State and in favor of a finding of future dangerousness; that he had not reviewed all of the testimony from the defense witnesses in reaching his conclusion; that substance abuse and child abuse may play a role in Chamberlain's behavior; that diagnosticians are cautioned against diagnosing antisocial personality disorder when there is a substance abuse problem; that the American Psychiatric Association had censored a psychiatrist for making absolute predictions about a person's future dangerousness; and that Dekleva had made predictions about a person's future behavior that had proved to be incorrect.  (State Habeas R. 85).

The state court noted that Texas law required a defendant to submit to a state-sponsored psychiatric examination if he intended to introduce his own expert psychiatric testimony on the issue of future dangerousness.  (State Habeas R. 83-84).  Defense counsel had retained Crowder to examine Chamberlain, but as a strategic matter, had also advised Chamberlain to assert his Fifth Amendment right against self-incrimination and not speak with Dekleva.  Chamberlain followed that advice.  (State Habeas R. 84).  The state court determined that trial counsel had hoped to circumvent state law and set a ground for appeal (based on Chamberlain's Fifth Amendment rights) by waiting to call Crowder  as a rebuttal witness only after the prosecution had its own expert witness testify.[11]

 (State Habeas R. 84-86).  The state court further determined that there was no reasonable probability that Chamberlain would not have received the death penalty even if a non-examining mental health professional had testified on his behalf.  (State Habeas R. 87-88).

---

[11]  The exclusion of Crowder's testimony was one of the grounds of error alleged on direct appeal.  State law available at the time of Chamberlain's trial had involved instances where the defense had attempted to introduce the psychiatric testimony during its case-in-chief, but Chamberlain was unsuccessful on appeal in trying to distinguish his situation on the basis that the testimony was offered in rebuttal.  *Chamberlain*, 998 S.W.2d 233-34.  The Texas Court of Criminal Appeals ruled that the exclusion of the defense expert was not an issue of timing.  Instead, the exclusion turned on the defendant's refusal to agree to an interview with the prosecution's expert.  *See id.*

Because claims of ineffective assistance of counsel involve mixed issues of law and fact, Chamberlain must demonstrate that the state court's rejection of his claim involved an unreasonable application of the law to the facts.  28 U.S.C. § 2254(d)(1).  The state court found that Crowder had been prepared and available to testify on Chamberlain's behalf if Chamberlain had been willing to be interviewed by the State's expert.   (State Habeas R. 84).  Chamberlain does not challenge the accuracy of this finding or assert that he would have been willing to participate in an interview with the State's expert.  Chamberlain also does not contest the state court's determination that defense counsel was successful in pointing out several weaknesses in Dekleva's testimony about Chamberlain's future dangerousness.  Chamberlain offers no evidence to demonstrate that Crowder could have limited his testimony to exclude information acquired from interviews and psychological testing or that another mental health professional would have testified favorably on the issue of future dangerousness without first examining Chamberlain.

Chamberlain has not demonstrated that the state court was unreasonable in finding that defense counsel was not ineffective and that Chamberlain was not prejudiced as a result of defense counsel's failure to present expert witness testimony on the issue of future dangerousness.

3.      Ineffective Assistance of Appellate Counsel

Chamberlain contends that his appellate counsel was ineffective in failing to complain on appeal of the trial court's sua sponte removal of the defense attorney initially appointed to represent Chamberlain.  Persons convicted of a crime are entitled to the constitutionally effective assistance of counsel in their first appeal as a matter of right. *See Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 834-35, 83 L.Ed.2d 821 (1985).  Appellate counsel's performance on appeal is judged under the same test that governs a review of trial counsel's performance. *Smith v. Robbins*, 528 U.S. 259, 285,

120 S.Ct 746, 764, 145 L.Ed.2d 756 (2000).  *See generally Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984).

Dallas County Assistant Public Defender Rick Magnis was initially appointed to represent Chamberlain at trial.  (State Habeas R. 57).  In November 1996, Chamberlain's family wrote to the trial court and asked that different counsel be appointed.  (Clerk's R. 7).  The trial court in turn asked Magnis to visit with Chamberlain.  (Clerk's R. 6; State Habeas R. 57).  On November 18, 1996, Magnis was replaced by attorney Wayne Huff.  Although no explanation appears in the record on direct appeal, Magnis explained via affidavit submitted during the state habeas proceedings that he asked to withdraw from the case after he accepted a different position within the Public Defender's Office as Chief of the Misdemeanors Section.   (State Habeas R. 59; State Habeas R. 178-79).  Chamberlain was thereafter represented by attorneys Wayne Huff and Doug Parks during the following months of pretrial proceedings and trial.

On appeal, effective assistance of counsel does not mean counsel who will raise every non-frivolous ground of appeal available or requested by the defendant. *See Evitts,* 105 S.Ct. at 835; *West v. Johnson,* 92 F.3d 1385, 1396 (5th Cir.1996).  Rather, it means–as it does at trial–counsel performing in a reasonably effective manner. *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998).  But regardless of whether appellate counsel should have complained of the substitution of counsel on direct appeal, there is  no reasonable probability that the outcome of the appellate proceedings might have been different.   In considering and rejecting Chamberlain's complaint of ineffective assistance of appellate counsel, the state court conceded that Texas law precludes a trial judge from sua sponte and arbitrarily removing appointed counsel over the objections of counsel and the defendant.  (State Habeas R. 57-58, 65).  *See generally Stearnes v. Clinton,* 780 S.W.2d 216, 221

(Tex.Crim.App.1989); *Springer v. State,* 940 S.W.2d 322, 323 (Tex.App.- Dallas 1997, no pet.). But the trial court found no evidence that counsel had been sua sponte replaced and further found that Chamberlain had not objected to the change in counsel at any time before he was convicted. (State Habeas R. 58). The state trial court noted that a defendant's failure to object to the substitution of counsel likely waives the error, if any, for purposes of an appeal. (State Habeas R. 58). *See Springer*, 940 S.W.23 at 324.

Chamberlain has not provided clear and convincing evidence to rebut the presumption of correctness that must be afforded to the state court's findings or otherwise demonstrated a reasonable probably of a different result had appellate counsel raised this point on direct appeal. Chamberlain has failed to demonstrate that the state court adjudication of his claim of ineffective assistance of appellate counsel was an unreasonable application of the law to the facts in his case.

### 4. Factual Sufficiency of Future Dangerousness Evidence

Chamberlain contends that the Texas Court of Criminal Appeals violated due process by refusing to review the factual sufficiency of the evidence adduced to support a finding of future dangerousness. The Texas Court of Criminal Appeals found the evidence legally sufficient to support the jury's finding that Chamberlain posed a continuing threat to society, but declined to review the factual sufficiency of the evidence under state law.[12] *Chamberlain*, 998 S.W.2d at 232-34. Chamberlain contends that he was thus denied meaningful appellate review of his death sentence.

The constitutionality of Texas' death penalty statute is predicated on the existence of

---

[12] The Court of Criminal Appeals explained that it was the nature of the special issues and not a lack of power or jurisdiction that prevented it from reviewing the factual sufficiency of the evidence. *Chamberlain*, 998 S.W.2d at 234.

meaningful appellate review to avoid the arbitrary application of the statute.  *See Clemons v. Mississippi*, 494 U.S. 738, 748-49 (1990); .  *Martinez v. Johnson*, 255 F.3d 229, 241 (5th Cir. 2001). But the Fifth Circuit has determined that appellate review of the sufficiency of the evidence to support a death sentence is meaningful if conducted under the *Jackson v. Virginia* standard. *Martinez*, 255 F.3d at 242-44 & n. 17.  *See generally Jackson v. Virginia*, 443 U.S. 307 (1979). Chamberlain does not dispute that the Texas Court of Criminal Appeals applied the proper federal standard of review for legal sufficiency claims as set forth in *Jackson v. Virginia*.  He also does not challenge the legal sufficiency of the evidence to support a finding of future dangerousness.  Instead, he focuses on the state court's failure to apply the state-created standard for reviewing the factual sufficiency of the evidence in criminal cases, which was recognized by the Texas Court of Criminal Appeals in *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996).   Chamberlain states no cognizable basis for federal habeas corpus relief.

Chamberlain's complaint revolves around the Texas courts' authority to conduct a factual sufficiency review, but that authority emanates from state constitutional law and state case law sources.  There is no corresponding federal constitutional right recognized by the United States Supreme Court, and for the court to grant Chamberlain's request and recognize such a right now would result in the creation of a new rule of law in violation of *Teague v. Lane*, 489 U.S. 288, 301 (1989).  Chamberlain has failed to show that the Texas Court of Criminal Appeals' adjudication of his claim was either contrary to, or an unreasonable application of clearly established federal law.

5.      Ineffective Assistance of State Habeas Counsel

Chamberlain requests that his case be remanded because he was not effectively represented by his state habeas counsel. The United States Supreme Court has determined that there is no

constitutional right to the assistance of counsel in a state habeas corpus challenge to an otherwise final criminal conviction. *See Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). Errors in state post-conviction proceedings will not entitle a petitioner to federal habeas relief because the attack is on a proceeding collateral to the detention and not the detention itself. *See Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir.1997); *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir.1995).

Constitutional error at the trial or direct review level must be found in order to issue the writ. *Morris v. Cain,* 186 F.3d 581, 585 n. 6 (5th Cir.1999). Chamberlain's complaints about deficiencies in the performance of his state habeas counsel present no cognizable basis for federal habeas relief.

### H.  EVIDENTIARY HEARING[13]

Chamberlain requests an evidentiary hearing to develop his more fact-intensive claims. Under the AEDPA, a petitioner is not automatically entitled to a federal evidentiary hearing. The AEDPA, codified in Section 28 U.S.C. § 2254(e)(2), imposes significant limitations on a petitioner's right to a hearing:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>   (A) the claim relies on--
>   (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;  or
>   (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence;  and
>   (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would

---

[13] Chamberlain also asks that the habeas record be expanded to include the clerk's record and reporter's record, as well as documents related to his direct appeal and the state habeas proceedings. These materials were submitted by the Respondent and are already before the court.

have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  Thus, the petitioner must show cause for his failure to more fully develop his claim during the state proceedings and demonstrate prejudice by showing that he would not have been adjudged guilty.  Chamberlain does not allege or establish cause to excuse his failure to more fully develop his claims in state court, nor does he demonstrate how his claims would be materially advanced by a hearing.  The present record is sufficient to permit the federal courts to make an informed decision about the merits of Chamberlain's petition.  No evidentiary hearing appears necessary, and Chamberlain's  request for such a hearing is denied..

ORDER

Having concluded that Petitioner's claims are either meritless or procedurally barred as addressed above, it is ORDERED that Petitioner Chamberlain's Petition for Writ of Habeas Corpus is denied.

SIGNED November 29, 2006.

_____
JERRY BUCHMEYER
SR. UNITED STATES DISTRICT JUDGE